**Opinion issued August 27, 2013**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-12-00065-CR

————————————

**CHARLES EDWARD STEWARD, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 179th District Court**
**Harris County, Texas**
**Trial Court Case No. 1286433**

---

## MEMORANDUM OPINION

A jury convicted appellant Charles Edward Steward of murder and assessed

his punishment at confinement for life.  *See* TEX. PENAL CODE ANN. § 19.02(b)

(West 2011).  In two issues on appeal, Steward contends that the trial court abused

its discretion by (1) denying his motion for a mistrial after the prosecutor commented on his failure to testify, and (2) overruling his objection that the probative value of the evidence that the murder weapon had been seen in his brother's possession was substantially outweighed by the danger of unfair prejudice. We affirm.

## Background

Steward was the longtime boyfriend of Barbara Smith, with whom he had a son. In 2007, Steward, who was unemployed, lived with Smith in a townhouse. Around that time, Steward's brother Ricky also lived with the couple. Smith and Steward's relationship became strained, and Smith expressed that she was ready to leave Steward. A friend of Smith's testified that Steward assaulted Smith on several occasions, choking and hitting her. Smith ultimately broke up with Steward and asked him to leave, but he refused. Even after changing the locks to the townhouse, Steward would return by sneaking in through a sliding door. At the time of Smith's death, Steward was staying with her against her wishes, and they would often argue.

One day in mid-September 2007, Smith called Ricky while he was at work and asked him to help Steward remove his possessions from the townhouse. Ricky arrived around 11:00 p.m. He walked upstairs and saw a pool of blood at the top of the stairs, but he saw no signs other signs of disturbance or forced entry. For a

2

moment, Ricky thought Steward may have been playing a practical joke. Ricky knocked on the door and heard what sounded like whispering. He kept knocking and demanded that Steward answer the door, which was locked on the inside. He retrieved a knife from the kitchen and attempted to pry open the door. When that failed, Ricky knocked down the door with his shoulder.

Inside the room, illuminated only by a television, Smith was lying facing down on her stomach. Steward was lying with his face directed towards the ceiling, with his head covered in blood. Ricky touched Smith and felt that she was cold. He then ran to the apartment complex's security guard, Javier Meija, and told him that Smith and Steward were dead. Ricky and Meija went into the townhouse. To Meija, it appeared like something had been dragged from the pool of blood into the bedroom. Meija noticed Steward's body was propped up against a mattress, and he saw a gun by Steward's feet. Meija immediately kicked it away. He called 9-1-1, and both he and Ricky noticed that Steward was still breathing, although his skull was cracked open and his brain was exposed. The police arrived and ordered Ricky and Meija to leave the room.

After securing the gun and the scene, the police also saw that Steward was trying to breathe, and they immediately called the paramedics. The paramedics confirmed that Smith was dead, and they transported Steward to the hospital. The police collected the gun and part of the pistol grip, which had become separated

3

from the gun, along with one spent shell casing and one live round of ammunition. They took pictures of the scene and obtained bloodstain swabs. The townhouse showed no signs of forced entry, and none of the contents of the apartment had been disturbed. The police officers formed the opinion that a murder and attempted suicide had occurred. At trial, the State produced a recording of a telephone call Steward made while in jail, in which he said, "I did the crime, I've got to do the time."

The autopsy results indicated that Smith had been shot at contact range in the chest. The bullet pierced her heart and lungs and exited through her back. Smith's body did not display any wounds consistent with defending herself from an attacker. Based on where the investigators found a spent shell casing and the location of a bullet hole, they concluded that Smith was shot in front of her closet. Bloodstains on the bedroom door suggested that Smith ran out of the bedroom and collapsed on the stairs, and the bloody drag marks suggested she was then dragged back into the bedroom.

A firearms examiner concluded that a bullet found lodged in the bedroom wall had been fired by the gun found in the bedroom. A fingerprint was later found on the gun, but it did not match any known fingerprints, including Steward's. To demonstrate access to the gun, the State produced testimony from Candace Green, a friend of Steward's brother Brandon, that the gun found at the

4

scene belonged to Brandon. She remembered that Brandon had shown off a gun with a loose grip with tape around it about a year before the killing. She recognized the gun at the scene because, like Brandon's gun, it had a loose handle. The gun grip recovered from the scene had adhesive, indicating the prior presence of tape.

During closing arguments, defense counsel commented on the State's inability to provide evidence about that amount of time that might have elapsed between the time Smith was shot and the time Steward was shot. Specifically, defense counsel argued as follows:

> I don't know if the State will try to make anything of the fact that [Smith] was cold to the touch. Obviously, she had been gone for a period of time, but Mr. Steward was still alive. So, there is no way to tell if he was shot momentarily after her or a long time after. Yes, time went by before they were found. That's why she was cold to the touch, but there is no way you can extrapolate from that how much time went by between her being shot and Mr. Steward being shot. One of many things you won't be able to determine from the evidence.

In its closing, the State responded to the argument as follows:

> [State]: But what makes more sense? That he has just shot his girlfriend, doesn't know what to do, so he panics. He tries to clean up the scene. How long he looked at her body, we'll never know. We will never know. The one person that can tell us how long she was there, he killed her.
>
> [Defense Counsel]: Objection, Your Honor, It's a comment on his failure to testify. I'd ask that the jury be instructed to disregard that comment.

5

[State]:  Judge, the one person—if I may respond—we didn't hear from is Barbara Smith.  That's who that comment is referring to.

[Trial Court]:  I'm going to overrule it.  I think—you're the triers of fact, ladies and gentlemen, you are the judges.  You are going to rely upon your memory.  And he doesn't have to testify.  No one is commenting on that.  And it's not legal to comment.

[Defense Counsel]:  Move for a mistrial.

[Trial Court]:  That's denied.

[State]:  Let me clarify, if it wasn't clear the first time.  The one person who could tell us when she was shot and low long she laid there is Barbara Smith.  And he killed her.  So, we don't get to hear from her.  Instead, we get to hear from the witnesses who knew her and the circumstantial evidence, which each little piece is like a little witness that tells you what that piece of evidence knows.

The jury convicted Steward of murder, and he then filed this appeal. On appeal, Steward contends that the trial court erred by overruling his motion for mistrial based on the prosecutor's alleged comment on his failure to testify and in admitting the testimony of his brother's friend concerning ownership of the murder weapon.

**Analysis**

**I.    Denial of mistrial**

In his first issue on appeal, Steward contends that the prosecutor improperly commented on his failure to testify, and that the trial court erred by overruling his motion for a mistrial.  We review a trial court's ruling on a motion for mistrial for

6

abuse of discretion. *Archie v. State*, 221 S.W.3d 695, 699–700 (Tex. Crim. App. 2007).

To determine whether the trial court abused its discretion by denying a motion for mistrial, we apply a version of the *Mosley* test. *Id.*; *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004); *see Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998). We consider three factors: (1) the severity of the misconduct (the magnitude of the prejudicial effect), (2) the measures adopted to cure the misconduct, and (3) the certainty of conviction absent the misconduct. *Archie*, 221 S.W.3d at 700; *Hawkins,* 135 S.W.3d at 77. A mistrial is required only in extreme circumstances when the prejudice is incurable. *Archie*, 221 S.W.3d at 699 (quoting *Hawkins*, 135 S.W.3d at 77).

We conclude that any prejudicial effect under the first *Mosely* factor was not severe. The prosecutor's comment that "we'll never know" how much time passed between the murder and the attempted suicide was not a clear reference to Steward's failure to testify in the guilt-innocence phase of the trial. To the contrary, the prosecutor clarified that he was commenting on Barbara's inability to testify because she was dead. The prosecutor did not repeat his comment. During an earlier portion of the State's closing argument, the prosecutor stated:

> [I]t's here in your charge, you are not to hold the fact that Mr. Steward chose not to testify against him. I'm asking you not to do that. [The second prosecutor] is asking you not to do that. If anybody goes back there and even mentions it, you immediately scold them and tell them

7

that is absolutely not the right thing to do. It's against the law. It's against the constitutional right that this man has. You don't need to concern yourself with that because we have proven our case beyond a reasonable doubt.

In addition, the issue Steward claims was a comment on evidence that only he could provide, the length of time between the two shootings, was not an element of the State's burden of proof and was an insignificant issue in the case.

Applying the second *Mosley* factor, the trial court took immediate curative measures. Although the trial court overruled Steward's objection, it nevertheless instructed the jury that he did not have to testify and that it would not be "legal" to comment on his failure to testify. Furthermore, the trial court's written charge to the jury included the following instruction:

> Our law provides that a defendant may testify in his own behalf if he elects to do so. This, however, is a right accorded a defendant, and in the even he elects not to testify, that fact cannot be taken as a circumstance against him.

> In this case, the defendant has elected not to testify and you are instructed that you cannot and must not refer to or allude to that fact throughout your deliberations or take it into consideration for any purpose whatsoever as a circumstance against him.

*See Hawkins*, 135 S.W.3d at 84 (discussing curative measures including trial court's instruction to disregard, court's admonition that prosecutor's statement was improper, prosecutor's apology and retraction, and proper instruction in jury charge).

8

Finally, applying the third *Mosley* factor considering the likelihood of Steward's conviction in the absence of the comment, the record reveals that the jury's verdict was well supported by other evidence. Although there were no witnesses to the crime, there was a significant amount of circumstantial evidence. First, Smith had demanded that Steward move out of her apartment and had called his brother to come and help him move. There was evidence that Steward had earlier assaulted and threatened Smith. Steward could not be excluded as a contributor to DNA found under Smith's fingernails. Smith was apparently shot in the hall, then dragged back into her bedroom, where she died. Only she and Steward were found behind a locked door leading to that bedroom. Contrary to Steward's hypothetical, there was no sign that an intruder had entered the apartment. A gun belonging to his brother was found at Steward's feet, and he had suffered what appeared to police to be a self-inflicted gunshot wound. Steward also made what could be considered an inculpatory statement in his phone call from the jail in which he stated, "I did the crime, I've got to do the time."

Balancing all three *Mosley* factors, and assuming without deciding that the prosecutor's comment was impermissible, any prejudice from the comment was isolated and not egregious, and the court took appropriate curative actions to mitigate any harm. In addition, based on the evidence presented, we conclude that the jury would likely have reached the same verdict even without the prosecutor's

comment. *See Archie*, 221 S.W.3d at 700. Thus, we conclude that the trial court did not abuse its discretion in denying Steward's motion for mistrial.

Accordingly, we overrule Steward's first issue.

## II. Statement of ownership of the murder weapon

At trial the State called Candace Green as a witness, and she identified the handgun that was recovered from the murder scene. Green testified that the gun belonged to Steward's brother, Brandon, and that she recognized it because the grip was loose and the handle previously had tape on it. Brandon had brought the gun to her apartment and had been showing it off to Green's boyfriend. Steward was also present when Brandon showed the gun, but Green never saw Steward handle the gun, nor had she seen it at Smith's home.

In his second issue, Steward contends the trial court abused its discretion by "admitting testimony that a witness had seen the murder weapon in Steward's brother's possession when there was no evidence Steward had ever possessed the gun." Specifically, Steward argues that the trial court erred in overruling his Rule 403 objection to Green's testimony.

We review a trial court's decision to admit or exclude evidence under an abuse of discretion standard. *Casey v. State*, 215 S.W.3d 870, 879 (Tex. Crim. App. 2007). A trial court abuses its discretion when its decision lies outside the zone of reasonable disagreement. *Id.* Relevant evidence may be excluded if its

probative value is substantially outweighed by the danger of unfair prejudice. *See* TEX. R. EVID. 403. Unfair prejudice refers to the likelihood that the jury would decide the case on an improper basis, commonly, though not necessarily, an emotional one. *See Gigliobianco v. State*, 210 S.W.3d 637, 641 (Tex. Crim. App. 2006). There is a presumption that relevant evidence is more probative than prejudicial. *Santellan v. State*, 939 S.W.2d 155, 169 (Tex. Crim. App. 1997). The Court of Criminal Appeals has identified a non-exclusive list of factors to apply in making a Rule 403 analysis. These factors include, but are not limited to: (1) how probative the evidence is; (2) the potential of the evidence to impress the jury in an irrational but indelible way; (3) the time the proponent needs to develop the evidence; and (4) the proponent's need for the evidence. *Reese v. State*, 33 S.W.3d 238, 240–41 (Tex. Crim. App. 2000).

The State sought to prove that Steward possessed the murder weapon. That Smith was shot with a weapon to which Steward had access because it belonged to his brother would make it more likely that he possessed the murder weapon and less likely that Smith was shot by someone else, such as a stranger or intruder. Additionally, the State sought to prove Steward's access to the gun because his fingerprints were not found on the weapon, and Steward's defense proposed that an intruder had shot Smith. Thus, the first factor favors finding that the evidence was probative.

11

Regarding the second factor, the fact that Steward may have had access to his brother's weapon is not any more harmful than the evidence that the weapon was found at Steward's feet after the shooting. The evidence does not suggest any extraneous offense and nothing about it was likely to impress the jury in an irrational or indelible way. Thus, the second factor favors admission of the evidence.

The questioning of Green about the gun took very little time at trial, and it comprised just eight pages of testimony in an eight-volume reporter's record. Thus, the third factor favors admission of the evidence.

Finally, the State sought to introduce the evidence that the murder weapon belonged to Steward's brother to establish that it was unlikely that the murder was committed by a stranger or intruder. The fact that Steward's brother owned the gun made it more likely that the weapon was used by someone who knew the brother and may have had access to his belongings, such as Steward. His brother's ownership of the gun was also probative to show that Steward used the gun although the forensic examiner had not been able to identify Steward's fingerprints on it. Thus, the State's need for the evidence also favored its admission.

"[W]hen determining whether evidence is admissible under Rule 403, we do not consider just whether the evidence is more prejudicial than probative, we consider whether the probative value is *substantially* outweighed by the danger of

12

*unfair* prejudice." *Garcia v. State*, 201 S.W.3d 695, 704 (Tex. Crim. App. 2006). Given the minimal danger of the jury drawing any unfair conclusions from Steward's presence when his brother displayed the gun and the probative value of being able to link Steward to the murder weapon, we conclude the trial court did not err in overruling Steward's Rule 403 objection. The trial court could have reasonably concluded that the probative value of the testimony about the gun was not substantially outweighed by the danger of unfair prejudice.

Accordingly, we overrule issue two.

### Conclusion

We affirm the trial court's judgment.

Michael Massengale
Justice

Panel consists of Chief Justice Radack and Justices Sharp and Massengale.

Do not publish. Tex. R. App. P. 47.2(b).

13